UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS WASHAM,

               Plaintiff

      v.

DOCTOR PRINCE, *et al*.,

               Defendants.

CIVIL ACTION NO. 1:25-CV-01365

(MEHALCHICK, J.)

**MEMORANDUM**

Thomas Washam, a prisoner proceeding *pro se*, has filed a second amended complaint in this fee-paid case under 42 U.S.C. § 1983, alleging that he received inadequate medical care at SCI-Dallas. (Doc. 30). Washam has not stated a viable federal claim despite multiple attempts, and the Court will decline to exercise supplemental jurisdiction over his state law claims. Therefore, the complaint will be dismissed and the case closed, but Washam may pursue these state law claims in state court.

I.    **BACKGROUND AND PROCEDURAL HISTORY**

Washam's initial complaint was subject to dismissal for failure to state a claim. *See* (Doc. 19, Doc. 20). He then filed an amended complaint that was unsigned and did not clearly state the requested relief or the intended defendants. The Court permitted him one final opportunity to file an amended complaint. *See* (Doc. 26, Doc. 28). In his new complaint (Doc. 30), Washam's allegations remain difficult to follow, but they will be construed liberally in accordance with the directive that "a *pro se* complaint . . . [is] held to less stringent standards

than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). [1]

Washam alleges as follows: On December 13, 2024, at SCI-Dallas, he attended a medical appointment to address a set of urological complaints, which he had "complained of for a month." Between December 10, 2024, and January 31, 2025, Washam repeatedly "visited sick call and spoke to a number of nurses and physician assistants about his medical conditions." His attached medical records document two such visits: first, on January 1, 2025, Washam complained to PA Rozalyn Atherton that "when I urinate, I get a [headache] and sometimes dizzy." Washam believed he "might have a urethral stricture which may require surgery to fix." Atherton wrote: "[U]nable to place a urology consult as it would require approval by Dr. Prince, who has already denied this." (Doc. 26-5). The next day, January 2, Washam reported that he was not presently feeling dizzy but was "still concerned about" pressure in his forehead when he urinates. The provider indicated that defendant Dr. Prince had already evaluated Washam and refused a urology consultation. (Doc. 26-6 at 1-2).

Washam alleges that on February 6, 2025, "matters were intensified due to a syncopal episode where [Washam] passed out and smacked his skull on the concrete floor of the housing unit." Washam contends that he suffered "a jarring blow to the head and brain that resulted in a constant concussed state of function and an unstable cerebral connection to his

---

[1] In evaluating Washam's allegations, the Court has also considered Washam's attached prior complaint (Doc. 30-2) and the medical records referenced in that prior complaint. Although the medical records were not attached to this complaint, we infer from his references to those records that Washam intended those to be considered. *See* (Doc. 28 at 2 (prior order advising Washam that "he may refer to the exhibits submitted with his prior complaint, and the referenced exhibits will be considered as if submitted with the new complaint").

life." In the infirmary, Washam was examined by defendant Atherton, who noted that Washam was "sitting up on the stretcher, in [no apparent distress], appears well, talking and moving all extremities." (Doc. 26-8 at 1). However, Washam alleges that Atherton "attempted to distort and skew the assessment of his injuries to align with Dr. Prince's determination that no CT or MRI was necessary."

The next day, February 7, Washam saw Dr. Prince, and complained of intermittent dizziness. Dr. Prince noted that Washam first complained of dizziness "ever[y] 45 minutes," but then referred to "weekly" episodes. Dr. Prince made the following assessment: "All recent urine cultures have been negative, labs have been unremarkable. He has not been found to be orthostatic. Labs were drawn this morning. Keep him in the infirmary for the weekend and review labs on Monday. Consider Holter and/or echo to rule out cardiac issue. No need for CT/MRI or urology evaluation." (Doc. 26-8 at 5-6).

Washam speculates that he may have suffered "neurological damage permanent in nature" from his February 6 fall, and he contends that Dr. Prince should have ordered a CT scan or an MRI. During a follow-up appointment on June 24, 2025, Dr. Prince allegedly "told Washam that his fall was not the cause of his [ongoing] dizziness." The record of this June 24 meeting indicates that Washam complained of "[d]izziness and unsteadiness. Not as frequent as it had been. Every couple of days. He attributes it to a head injury in January or February." However, Dr. Prince noted that Washam "had symptoms even before hitting his head." A "neuro exam" of Washam was "normal." (Doc. 26-9 at 1-3). Addressing Washam's request for a CT scan or MRI, Dr. Prince wrote:

> [Patient] was informed that he doesn't need any head imaging at this time, that his neuro exam is normal. [T]he head pain he felt 1 wk ago is unlikely due to an aneurysm because the pain he felt does not fit the picture of an aneurysm and if he had an aneurysm rupture 1 wk ago, he would be sick at this point . . .

3

> Also discussed that we can't just obtain x-rays or CT scan because someone wants them . . . we have to weigh risk vs. benefit as radiation can lead to cancer in the future and since his neuro exam is normal, it is not felt to be necessary at this time.

(Doc. 26-9 at 3). The medical records document two more appointments in which Washam saw nurses and demanded a CT scan or MRI, but was refused. *See* (Doc. 26-9 at 5-8). Washam reported to the medical staff that Dr. Prince said his "superior would get mad" if he recommended imaging. Washam generally alleges that Dr. Prince and defendant Tammy Gola "had some sort of consensus [that] cost for medical procedures would [be] prioritized over [Washam's] health and well-being."

With respect to his urological complaints, Washam contends that defendant Dr. Prince "was deliberately indifferent. . . because for 30 days he tried to convince Plaintiff that a urologist couldn't help his condition." In April 2025, approximately four months after he began complaining of urological symptoms, Washam was sent to a urologist. Washam does not describe what happened at this appointment, and has not submitted a record of it, but later medical notes indicate that Washam "was started on [Flomax] in April for urgency, hesitancy[,] weak stream, and straining to void." By November 2025, Washam's stream was "now strong," but he was "worried" about penile pain. In response to this complaint, he was prescribed Bactrim, an antibiotic, and scheduled for a follow-up in six months. The notes of this meeting reflect a urinary tract infection at some unspecified time within his "past medical history," but do not reflect any clear diagnosis of his current problem. *See* (Doc. 26-7).

The scope of Washam's intended claims is unclear, but he appears to assert Eighth Amendment deliberate indifference and medical negligence claims against eight defendants: Wellpath (the prison medical provider), Dr. Prince, Gola, S. Machinowski, Jasen Bohinski, Laurel Harry, Atherton, and Nancy Hogan.

4

## II.    28 U.S.C. § 1915A SCREENING

Under 28 U.S.C. § 1915A, the Court is obligated, prior to service of process, to screen a civil complaint in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a); *James v. Pa. Dep't of Corr.*, 230 Fed. App'x 195, 197 (3d Cir. 2007). The Court must dismiss the complaint if it fails to state a claim upon which relief can be granted. 28 U.S.C. § 1915A(b)(1); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010). In performing this mandatory screening function, a district court applies the same standard applied to motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Mitchell*, 696 F. Supp. 2d at 471; *Banks v. Cty. of Allegheny*, 568 F. Supp. 2d 579, 588 (W.D. Pa. 2008).

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions which are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the amended complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the elements that make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the

5

assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions' . . . ." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). Nor need the court assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the amended complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

**III.**     **DISCUSSION**

A.   SECTION 1983

42 U.S.C. § 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To succeed on a Section 1983 claim, a plaintiff must demonstrate that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). "A defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence,'" and cannot be premised on the operation of *respondeat superior*. *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Rode*, 845 F.2d at 1207).

The constitutional claims against several of Washam's named defendants (Tammy Gola, S. Machinowski, Jasen Bohinski, Laurel Harry, and Nancy Hogan) must be dismissed, because the complaint does not adequately allege their personal involvement. *See Rode*, 845 F.2d at 1207-08. Defendant Nancy Hogan is alleged to have "systematically rejected" Washam's prison grievances "without legitimate cause," but a prisoner has no constitutional right to a grievance procedure (*see Burnside v. Moser*, 138 F. App'x 414, 416 (3d Cir. 2005)), nor would mishandling of a grievance demonstrate personal involvement in any underlying violation. *See Brooks v. Beard*, 167 Fed. Appx. 923, 925 (3d Cir. 2006).

Defendants Bohinski (the Warden of SCI-Dallas) and Harry (the Secretary of the Pennsylvania Department of Corrections) are not personally liable for Washam's medical care based on their supervisory roles at the prison. *See Dooley, 957 F.3d at 374*. Washam

contends that he "informed Mr. Bohinski about Dr. Prince's ineptness and unprofessional treatment," but this conclusory allegation does not plausibly suggest that Bohinski was personally involved in his medical care. *See*, *e.g.*, *Holland v. Weller,* No. 3:24-CV-2201, 2025 WL 308127, at *3 (M.D. Pa. Jan. 27, 2025) (a prison administrator "cannot be considered deliberately indifferent 'simply because [he] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor'") (quoting *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1991)).[2]

Washam also names Wellpath, the prison's corporate medical provider, but the complaint does not state any allegations against Wellpath or identify a corporate policy, custom or practice that would facilitate liability against Wellpath. *See Montanez v. Price*, 154 F.4th 127, 142 (3d Cir. 2025) (citing *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978)). To the extent Washam relies on his vague allegation of "some sort of consensus [that] cost for medical procedures would [be] prioritized over [Washam's] health and well-being," he does not allege that this was a Wellpath policy. Nor would this allegation support a viable claim against Gola, Machinowski, or any other defendant: "General allegations that a prison medical provider had an incentive to save money, or to consider costs in providing health care, do not state a constitutional claim." *See Winslow v. Prison Health Servs.*, 406 F. App'x 671, 674 (3d Cir. 2011); *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) ("[T]he deliberate indifference standard . . . does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society.").

---

[2] Washam's allegation that he "spoke to" defendant Gola "about several conditions" is insufficient for the same reasons.

Therefore, the Court's Eighth Amendment analysis is directed to whether the complaint states a claim of deliberate indifference against Dr. Prince or PA Atherton.

B. EIGHTH AMENDMENT

A plaintiff can state a claim under the Eighth Amendment for denial of medical care by alleging (1) a serious medical need; (2) that the defendant was deliberately indifferent to that need; and (3) that the deliberate indifference caused harm to the plaintiff. *See Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023). Courts have found deliberate indifference "in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Upon careful review of Washam's allegations and accompanying exhibits, the Court finds that he has not stated a viable Eighth Amendment claim. First, he complains that he was not seen by a urologist until April 2025 for a urological problem he began complaining about in December 2024. However, he pleads no facts that plausibly suggest this delay was imposed for a "non-medical reason."[3] Washam's exhibits show that Dr. Prince examined Washam at the prison, reviewed blood tests and urine tests, and determined that a urology evaluation was inappropriate for the symptoms he was presenting at that time. *See, e.g.*, (Doc. 26-8 at 5). Even if Dr. Prince's assessments were wrong, misdiagnosis "at worst, amounts to

---

[3] As previously noted, Washam's assertion that his delayed referral was contrary to DOC procedures does not state a constitutional claim. *See, e.g., Washington v. Salamon*, No. 4:21-CV-01746, 2023 WL 8703392, at *5 (M.D. Pa. Dec. 15, 2023) (a violation of prison policy is not itself a constitutional violation).

medical malpractice, which is not actionable under the Eighth Amendment." *Stewart v. Pennsylvania Dep't of Corr.*, 677 F. App'x 816, 820 (3d Cir. 2017).[4]

Nor has Washam plausibly alleged an Eighth Amendment violation relating to his head injury. Dr. Prince evaluated Washam and explained why he believed a CT scan or MRI was not indicated. Washam does not have a constitutional right to any particular test or course of treatment; specifically, refusing a prisoner's demands for a CT scan or MRI is not itself deliberate indifference. *See*, *e.g.*, *Robinson v. Sec'y Pennsylvania Dep't of Corr.*, 663 F. App'x 96, 98 (3d Cir. 2016) (no deliberate indifference where a prison doctor "consistently denied [the plaintiff's] requests for an MRI or CT scan as well as his demands to see a specialist" and instead "treated him on multiple occasions, performed medical exams, and provided him with pain killers"); *Dykeman v. Ahsan*, 560 F. App'x 129, 131 (3d Cir. 2014).

Washam claims that PA Atherton "attempted to distort and skew the assessment of his injuries" from the February 6 fall, but he does not state what Atherton specifically did or said that was incorrect.[5] He believes he is suffering from "a constant concussed state of function and an unstable cerebral connection to his life" because of this fall, but the medical staff generally disagreed that his later symptoms were attributable to the fall and explained

---

[4] Washam appears to believe that he had a urinary tract infection beginning in December 2024, but there is no indication that any defendant believed he had a urinary tract infection during that time, so this disagreement does not create a claim under the Eighth Amendment. Washam vaguely alleges that the "correction[al] facility" generally knew of "constant pain to his private area" (Doc. 30-3 at 1), but the medical records from January and February 2025 reflect complaints to the defendants of dizziness and headaches, rather than "constant" groin pain.

[5] Washam points to another nurse's "addendum" to Atherton's medical notes to reflect that he sustained swelling in the back of his head (Doc. 26-8 at 3), but the fact that another provider contributed to his medical notes does not plausibly suggest that Atherton was deliberately falsifying the notes.

why. *See*, *e.g.*, (Doc. 26-9 at 1-3) (in response to Washam's June 2025 complaints of dizziness, Dr. Prince noting that his neurological exam was normal and that he complained of the same symptoms prior to his February 6 fall); (Doc. 26-9 at 4) (nurse addressing Washam's complaint that he "felt a shock in his head" in August 2025).

Contrary to Washam's allegations that prison medical staff have done "nothing about" his medical complaints, he has been prescribed medication to treat his dizziness, *see* (Doc. 26-9 at 5-6), and medical staff are implementing measures recommended by the urologist in November 2025 (*see* Doc. 26-6 at 5-6). While the Court acknowledges Washam's allegations that he is suffering, the circumstances that he describes do not suggest a violation of his Eighth Amendment rights by any defendant. At most, Washam's allegations suggest negligence or medical malpractice, which are state law claims.

C. SUPPLEMENTAL JURISDICTION

With no surviving federal claim, the complaint provides no apparent basis for jurisdiction over Washam's state law claims. When a federal court dismisses all federal claims prior to trial, it "must decline" to exercise jurisdiction over state law claims "unless considerations of judicial economy, convenience, and fairness to the parties" dictate otherwise. *See Talley v. Clark*, 111 F.4th 255, 266 n.6 (3d Cir. 2024) (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)); 28 U.S.C. § 1367(c). At this early stage of the case, no such justification is apparent. Although Washam's federal claims will be dismissed with prejudice, his state law claims are dismissed without prejudice. *See Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009). Therefore, Washam may attempt to assert any claims of negligence or medical malpractice in state court.

11

## IV.    CONCLUSION

Because Washam "has already had two chances to tell his story," and has not stated a viable federal claim for relief or a plausible basis for jurisdiction over his state law claims, the Court finds that any further attempt to amend the complaint would be futile, and will dismiss this case without leave to amend. *See Jones v. Unknown D.O.C. Bus Driver & Transp. Crew*, 944 F.3d 478, 483 (3d Cir. 2019). An appropriate order follows.


**Dated: May 26, 2026**                                              *s/ Karoline Mehalchick*

                                                                                     **KAROLINE MEHALCHICK**
                                                                                     **United States District Judge**

12